# Sovereign Camp of the Woodmen of the World v. Havas.

(Decided January 28, 1927.)

## Appeal from Harlan Circuit Court.

1. Witnesses—Testimony of Widow that She Found Insured Dying with Gun Near Him Held Not Violative of Statute Relating to Transactions with Deceased Persons (Civil Code of Practice, Section 606, Subd. 2).—In action by widow on beneficiary certificate for death of husband, who committed suicide, admitting testimony of widow that on her return home she found deceased dying with gun near him, and that he never spoke again, held not improper under Civil Code of Practice, section 606, subd. 2, relating to transactions with deceased persons, where court expressly declined to permit witness to make any statement with reference to deceased's state of mind before that time, and suicide of deceased not being denied.

2. Evidence—Lay Witness May Express Opinion, Based on His Own Knowledge, as to Another's Mental Condition.—There is no rule preventing lay witness from expressing opinion based on facts within his knowledge as to another's mental condition.

3. Insurance—Evidence Held to Show Insured was Insane at Time of Suicide, Thereby Authorizing Recovery Under Certificate of Fraternal Insurance for Death by "External, Violent, and Accidental Means."—In action by widow against fraternal insurance company, on certificate covering death by violent and accidental means, evidence held sufficient to show deceased was so insane that his suicide was death caused solely and directly by "external, violent, and accidental means," entitling widow to recover under policy.

4. Insurance—Policy Signed by Insurer in One State, but Accepted in Writing by Insured in Another, Held Governed by Laws of State where Accepted.—Where policy of accident insurance was signed by fraternal insurance company in Nebraska, but accepted by insured in Kentucky, where he resided, policy was governed by laws of state of Kentucky; such state being place where final act occurred by which policy was made binding.

5. Insurance—Place of Acceptance by Insured of Policy is Presumed to be Place of his Residence.—Place where insured finally accepted insurance policy in writing is presumed to be place where he resided.

6. Insurance—Place of Insurance Contract is Place Where Final Act Occurs Making Policy Binding—"Place of Contract."—Place where final act occurs which makes policy binding on parties is "place of contract" of insurance.

7. Insurance—Law of Place of Performance Determines Validity and Construction of Insurance Contract.—Validity and construction

of insurance contract are to be determined by law of place of performance.

8.  States—Refusal to Construe Insurance Policy, Entered Into in Kentucky, According to Construction Adopted by State of Insurer's Domicile, Held Not Denial of Full Faith and Credit.—Where contract of insurance was entered into in Kentucky, refusal of court to construe provision of policy according to construction adopted and enforced under law of Nebraska, the domicile of insurer, held not refusal to give full faith and credit to laws of Nebraska under requirement of federal Constitution; opinions of Nebraska Supreme Court being no more binding on Kentucky courts with regard to policy than those of any other state.

J. S. FORESTER for appellant.

LYTTLE & MORGAN and C. B. SPICER for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

Appellant is a fraternal insurance company incorporated under the laws of Nebraska, and is authorized under the laws of this state to do business therein. It maintains subordinate lodges or camps in this state, as well as in many other states.

In 1922, for a consideration, it issued to Bela Havas a beneficiary certificate whereby it agreed to pay to appellee, the designated beneficiary therein and the wife of the insured, $1,000.00 upon his death, and an additional $1,000.00 in the event of his death from accident caused solely and directly by external, violent and accidental means.

Bela Havas died in May, 1924, and in this action by the beneficiary on the certificate it is alleged in the petition that he was dead, and came to his death as the result of an accident as defined in the policy, and the prayer was for a judgment for $2,000.00.

Under the terms of the policy appellant's articles of incorporation, its constitution, laws and by-laws, and application for membership, constitute the agreement between the parties, and any changes, additions or amendments to the articles of incorporation, or to the constitution, laws and by-laws, made or enacted subsequent to the issual of the policy, shall bind the member and his beneficiary just as if they had been made prior to and were in force at the time of the application for membership.

In the answer defendant denied that Bela Havas came to his death as the result of an accident as set forth in his policy, or as the result of an accident at all, or that he came to his death from any cause, or under any condition, except as the result of his own hand and act. Then in a second paragraph the provisions of the policy as set forth above are relied upon, and it is further alleged that under the constitution, laws and by-laws of appellant in force at the time the contract of insurance was entered into it is provided that if any member holding a certificate of insurance should die in consequence of his own act, whether sane or insane, such certificate shall be null and void; and it is alleged that the same provision was in the constitution, laws and by-laws of appellant adopted after the issual of the said policy, and it is then alleged that decedent came to his death as the result of a gunshot wound inflicted on his own person by his own hand.

The reply, after denying certain affirmative allegations in the answer, admits that Bela Havas came to his death as the result of a gunshot wound inflicted on his own person by his own hand, but affirmatively alleges that the occurrence was accidental, unpremeditated and without forethought, in that at the time said Havas so came to his death he was of unsound mind, and was crazy and his mind so far gone that he was unconscious of the fact that he was taking his life, and that at the time his mind was so deranged that he was not responsible for his act.

The affirmative allegations of the reply having been put in issue, the defendant thereafter filed an amended answer, wherein it is alleged that the rights and liabilities of the parties to this action must be enforced and determined, and the validity of its constitution, laws and by-laws controlled by the laws of Nebraska, and that the laws of that state uphold the validity of its laws and by-laws providing for the forfeiture of such a certificate when the death of a member is occasioned by suicide, whether sane or insane; and that under the full "faith and credit" provisions of the federal Constitution the courts of Kentucky are required to follow the holding of the Nebraska Supreme Court to the effect that appellant's by-law providing: "If the member holding this certificate . . . should die . . . by his own hand or act, whether sane or insane, . . . the certificate shall be null and void," is enforceable.

To this amendment a demurrer was filed and over-ruled, and, although defendant on the trial convincingly proved the law of Nebraska as alleged by it, the court on the trial submitted to the jury only the single issue whether decedent at the time he took his life was so insane that he did not know he was doing so, or that his act would cause death. The jury returned a verdict for the plaintiff of $2,000.00, from a judgment on which this appeal is prosecuted.

The three grounds for reversal are: (1) That the trial court permitted the beneficiary to give incompetent evidence, which is prohibited by subsection 2 of section 606 of the Civil Code. (2) That the verdict is flagrantly against the evidence on the issue as to decedent's state of mind when he killed himself. In other words, that the evidence of his insanity is insufficient to overcome the presumption of sanity. (3) That as a matter of law the contract of insurance is controlled by the laws of Nebraska, and that the courts of this state should follow the ruling of the courts of Nebraska in upholding the contract as written.

The evidence given by the beneficiary was only to the effect that, upon her return home after an absence, she found decedent lying in the house, and that a gun was near him, and that he never spoke again. The court expressly declined to permit this witness to give any facts or make any statements having reference to decedent's state of mind before that time. Obviously, therefore, the situation is essentially different from that in Equitable Life Assurance Society v. Bailey, 203 Ky. 339. In that case the trial court permitted the beneficiary to testify to things having a bearing upon the mental condition of her deceased husband, while in this case that is the very thing which the court declined to do. Clearly the physical facts this witness was permitted to state only went to establish a thing which was not in issue, namely, that decedent had killed himself. And if it had not so stood admitted, under the ruling in Combs v. Roark, Admr., 206 Ky. 454, evidence of such physical facts given by an interested party would have been competent.

Likewise appellant is in error in claiming that a lay witness may not express an opinion based upon facts within his knowledge as to the mental condition of another. Anderson v. Standard Accident Insurance Co., 205 Ky. 587.

A consideration of the second question involves a short statement of the evidence as to decedent's mental condition at the time of and just prior to his death. On this question the plaintiff only introduced three witnesses, two women, one of whom was an employee in and about his home and store, and the other a nearby neighbor frequently at his home, while the third was a man employee of decedent in his grocery business.

The woman employee stated that she had been working for decedent for about two years; that up to a short time before his death he was a friendly man who spoke to everybody, and never idled around but was industrious, but that for several days before that time his general demeanor had changed, and she saw him walking around and looking as if he was hunting for something, and that the evening before he shot himself, from his conduct and demeanor, "I knowed he was wrong." The witness then relates an incident occurring the day before his death when he drove up into his back yard with his truck loaded with groceries covered with an oil cloth to protect them from a rain then falling; he placed his truck in the place where he usually unloaded it, took the cover off the groceries, and then without unloading them got into the truck and drove back out into the rain with the groceries uncovered.

The next witness was a neighbor who had a son that worked for Havas, and who frequently made settlements with him for her son's work; she stated he was a pleasant and agreeable man generally and would greet her politely and say goodbye to her when they separated, but for a few days before his death she observed a change in his manner; that he walked around slow like he was looking for something on the ground, and that when he came to where she was he looked at her but did not speak; that he stood like he was in a deep study and looking on the ground, and that the day before he killed himself she judged from his appearance that his condition was bad.

The third witness was a man employee who had known decedent for about six years, and worked for him for about four years; that the morning of the day he killed himself he walked around over the floor and had nothing to say, and would rarely answer a question, and did not speak to him that morning when witness went to decedent's home or place of business; that he looked wild out of his eyes as if he was excited about something, and different from what he ordinarily looked, and "seemed to

be excited or crazy or something; he did not seem to be like he always was." The witness stated on cross-examination that he left decedent alone about an hour before he heard that he killed himself, and that decedent the day before had told him that a named man "was about to try to swear something on him, that seemed to be worrying him," and when asked whether Havas told him what it was he answered, "Over a girl up there, some way."

It may be admitted that this evidence that decedent's mind at the time he killed himself was so far gone that he did not realize the consequences of his act is not positively convincing, but when we consider that three persons intimately associated with him for some years had observed for the last few days before the tragedy that his whole demeanor had changed, and that there appeared to be some great weight upon his mind, and that it is disclosed, by inference at least, that there was hanging over him possibly a criminal prosecution by reason of his actual or supposed relations with some woman, it cannot be said that there was no evidence tending to show a state of mind that would under our rule in this state avoid that provision in the policy.

Nor are we impressed with the third contention. There is no allegation that the contract was made by the parties with reference to the laws of Nebraska, or that they contracted that they would be governed by the laws of that state in settling any controversy that might arise out of it. There is not even an allegation that the contract was made and completed by the parties in the state of Nebraska; on the contrary, it appears from the face of the policy that it was signed by appellant's officials at Omaha on the 3rd day of November, 1922, but was thereafter finally accepted in writing by the decedent on the 8th day of November, 1922, and presumably in the state of Kentucky, where he resided. So that the final act consummating the contract between the parties and putting it into effect took place in this state five days after appellant's officials had accepted the decedent's application and issued the policy in the state of Nebraska.

The general rule is that the place where the final act occurs which makes the policy binding on the parties is the place of the contract, and that the validity and construction of the contract are to be determined by the law of the place of performance. Prudential Life Ins. Co. of America v. Fusco's Admr., 145 Ky. 378; Haas v. Mutual

Life Ins. Co. of New York (Neb.), 1913V, Ann. Cas. 919, and note.

Nor is the refusal of the courts of this state to adopt the construction placed upon an insurance contract made in this state by a foreign corporation having its home office in another state, to adopt a construction and enforce a provision in such policy because such a construction has been adopted and enforced in the state of such foreign corporation, a failure to give full faith and credit to the laws of such other state within the meaning of the federal Constitution. The fact that the courts of Nebraska enforce the exception in such policies where the insured kills himself, sane or insane, does not give any extra-territorial effect to the opinions of its supreme court and are no more binding upon the courts of this state in determining whether they will enforce such a provision in a Kentucky contract than are the opinions of any other state. Washington Life Ins. Co. v. Glover, 78 S. W. 146.

It follows that the trial court properly declined to enforce the Nebraska rule, and in its instruction properly submitted the only issue between the parties

Judgment affirmed.